## NATIONAL LABOR RELATIONS BOARD v. BERSTED MFG. CO.

No. 8922.

Circuit Court of Appeals, Sixth Circuit.

Jan. 7, 1942.

Max W. Johnstone, of Washington, D. C. (Robert B. Watts, Laurence A. Knapp, Ernest A. Gross, and Samuel Edes, all of Washington, D. C., Earle K. Shawe, of Baltimore, Md., and Max W. Johnstone, of Washington, D. C., on the brief), for petitioner.

Walter Witherspoon, of Fostoria, Ohio (Walter Witherspoon, of Fostoria, Ohio, Earl F. Boxell and Welles, Kelsey, Cobourn & Harrington, all of Toledo, Ohio, and Fyffe & Clarke, of Chicago, Ill., on the brief), for respondent.

Before SIMONS, MARTIN, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

The National Labor Relations Board filed its petition for enforcement of an order restraining the Bersted Manufacturing Company from unfair labor practices, ordering reinstatement of an employee, Wilfred Frisch, with back pay, and requiring the posting of appropriate notices. Jurisdiction of the Board is admitted.

The respondent contends that there was no evidence to support the findings of the Board that there was a discriminatory discharge, and that the general order to cease and desist from unfair labor practices and discrimination in the discharge and hire of employees, is invalid.

In October, 1939, a CIO union commenced the organization of respondent's employees. Frisch became a member of this union on November 3rd, was elected vice-president, and was one of the leaders and most active members of the union among the employees. There was considerable feeling against the organization of this union, and many of the foremen of respondent's company were active in criticizing and discouraging membership. It appears, from the testimony of several employees, that Rudolph Jordon, foreman of the department in which Frisch was employed, took a strong interest in the matter and criticized the union. Dolan Dull, who had been elected president of the union, testified that Jordon approached him, remarked that he heard that he was president of the CIO, ascertained that he was purchasing a home in Fostoria, where

the company was located, and told him he'd better think it over before he joined the union, and that he did not care to see him lose his home. Frisch testified that Jordon told him that the CIO was "out" and that he should not "stick my neck out."

Shortly after the union started to organize respondent's employees, an inside union, or employee representation plan, was formed, which, according to Robert Tarris, an employee who was sworn as a witness for respondent, was for the purpose of stopping the CIO. Frisch testified that foreman Jordon approached him around the second or third week of November and suggested that he attend a meeting of employees, which was being held at the plant, and hear what they had to say. The meeting was being held in the press room before quitting time at noon. Three foremen, including Jordon, were present, together with approximately 25 employees. During the course of the meeting, an employee named Boyd made a speech, saying that there wasn't any need to pay dues out of town when they could have their own union. A few days after this meeting, there was another meeting of employees, on respondent's premises, at which foreman DeLine stated that the plant would close down if the union came in. Homer McCarley, an employee, places this meeting on about the 15th of November. Frisch stated that about four days after the meeting in the press room, foreman Jordon suggested that Frisch and Harold DeVore be the representatives from their department, under the employee representation plan. It appears that an election of representatives in the so-called inside union was carried on in the plant during working hours. Witnesses for both petitioner and respondent say this election was held for some departments on November 12, as nearly as they can remember. There is evidence that in certain departments ballot boxes were set up. Foreman Faber says that as soon as he had knowledge that a ballot box was placed in the room in which his desk was located, he ordered two employees, whom he assumed to be responsible for its being placed there, to remove it. A ballot box was set up in foreman Peterson's department, and Peterson told Tarris, according to the latter's testimony: "You fellows are supposed to hold an election for representatives. You know what it's for." But, Tarris stated, Peterson said he did not

want to be present while the election was being carried on. There was evidence of much other anti-union activity. Tarris testified that foreman Peterson told him that the employees should not join the CIO; that it was a "racketeering outfit"; that if the employees who joined the union dropped out, nothing would be held against them, but if they did not, it would be held against them. He also testified that Mr. Kaubisch, secretary and treasurer of respondent, stated that the company did not want the CIO in the plant; that the bonus of the employees would be doubled at Christmas of that year if there was no labor trouble; and that he reserved the right to run the plant or shut it down.

On November 22, 1939, Frisch was discharged from employment for alleged violation of a rule of the company against solicitation of union membership on company premises and on company time. Foreman Jordon testified that, although he had never heard Frisch soliciting union membership, he had warned him against it on numerous occasions. On the day of the discharge, Jordon says he was called to the office, where there were present five employees of respondent, foreman Faber, and president Bersted; that he was advised that four of the employees had complained that Frisch had solicited them for membership in the union. A fifth employee, who had spoken against the CIO at one of the employee meetings, signed one of the complaints concerning the alleged solicitation, as a witness. Two of these employees claimed that Frisch had solicited them at noon, which, Jordon testified, was unobjectionable. Another complained of being solicited six days previously. It does not appear why the employees gathered at the office at this time. None of them was sworn as a witness. Under all of the circumstances of the case, it was a fair inference that the meeting was held for the purpose of making a case against Frisch because of his enthusiasm for the CIO, rather than because of violation of a rule. Jordon says that upon Mr. Bersted's request for his opinion in the matter, he advised the discharge of Frisch. Shortly thereafter, he saw Frisch in the plant and in a friendly way notified him of the discharge. Respondent contends that Frisch was discharged for violation of the rule against union solicitation, after his failure to pay any attention to repeated warnings. The Board found that

the discharge resulted from discrimination against Frisch because of his union membership and activities.

In determining whether there was evidence to sustain the finding of the Board, it is necessary to consider the evidence with regard to the company's rule against solicitation, its observance and its application. Foreman Jordon says that the first time the matter of this rule was mentioned was approximately a year before the discharge of Frisch, when Mr. Kaubisch told him about the law—"that is to say, we are not allowed to solicit union memberships in the shop or on company time or property." But Jordon stated that "it was not exactly a rule at that time." The next occasion on which the so-called rule was mentioned, according to Jordon's testimony, was "right around November there sometime," when there were rumors of union activity but before anything became definite. At that time Jordon was told that "they were not allowed to solicit union membership on the premises." This was before the election of representatives under the employees' organization plan. Nothing was said about disciplining employees for such solicitation at that time, and Mr. Kaubisch did not speak again to Jordon on this subject; but Jordon states that the rule applied not only to solicitation of union membership, but to any discussions in favor of or against a union on company time and property during working hours "where they would keep other people from their work." He later qualified this by stating that he considered it was an offense to have an employee talk to another employee about union matters even if it did not interfere with the other employee, and that such conduct was subject to discipline and discharge. However, on another occasion, Jordon testified that he would not say that there was a rule against employees talking about unions. Mr. Kaubisch testified that shortly before he left on his vacation on November 14th, he had a conference with his foremen in which he told them to caution any employees who solicited memberships in a union on company time and on company property, and if such warnings were ignored, the offending employee would have to be dismissed. This rule was never posted on the bulletin boards, which were used to call the attention of employees to communications from the management, or reduced to writing. Many of the employees never heard of

such a rule until after the discharge of Frisch; and Frisch stated that he had never heard of the rule and had never been cautioned that he would be discharged if he solicited union membership or discussed the union in the plant. He further said that Jordon had hinted several times that he was not to talk about the union and that on the day he was discharged Jordon had told him not to solicit for the union, but had mentioned nothing about discipline. At no time was there any formal rule on solicitation, and from Jordon's testimony, it cannot be said conclusively that there was a definite rule of any kind on the subject. Certainly, such a rule was never communicated by Jordon to Frisch. Harold DeVore testified that he had often asked employees at the plant to join the union, in the presence of the foreman; and in one of the complaints filed by an employee, accusing Frisch of soliciting for the union, DeVore was also accused of the same conduct. No disciplinary measure, however, was taken against DeVore.

There is no claim that Frisch was a troublesome employee in the ordinary sense. He had worked for respondent for approximately three years. Apparently, he was on very good terms with his foreman even after he had joined the union. The foreman said that he "kidded" continually with Frisch, remarking on several occasions, "Here comes the vice-president." He also said that in his discussion about the union with Frisch, he wanted to give him the benefit of his experience. He suggested Frisch as the representative of the employees from his department in the so-called inside union. When Frisch was discharged, Jordon told him he was sorry and wished him luck. There is no claim that Frisch ever interfered with the work of any of the employees at any time he mentioned their joining the union. He admitted that on the day of his discharge, when an employee came to him to have him repair certain material, he asked such employee to join the union.

■ From the foregoing, we are of the opinion that reasonable inferences could be drawn by the Board that Frisch was discharged, not for violation of a rule of the company, but because he was active in the CIO. It may be conceded that he solicited employees in the plant during business hours, but much more extensive solicitation had been carried on for the

412

inside union by the foremen themselves; and petitioner's evidence shows that these activities continued even after the final interview of Mr. Kaubisch with the foremen. If there were ever a rule, it was in effect for a considerable time before the foreman or the officials knew of the actual organization work on behalf of the CIO in the plant; and if such a rule were in effect during this time, it was ignored in all the cases where activity and solicitation for the employee form of representation was carried on. Harold DeVore, who was admittedly guilty of the same solicitation as Frisch, was not disciplined or discharged. Frisch was one of the most active workers on behalf of the union. None of the officials of the company, nor the foremen, appeared to have cherished any personal animosity against Frisch. They apparently concluded that he was too stubborn and enthusiastic about the union. He failed to be impressed by their advice and counsel, the indirect threats, and the hostile attitude of respondent toward the union. Since the so-called inside union was permitted to undertake much greater organization activity than Frisch was ever accused of, the Board could fairly infer that the discharge of Frisch was discriminatory and resulted from his membership and activities in the CIO. See National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Waterman Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704; National Labor Relations Board v. Reynolds Wire Co., 7 Cir., 121 F.2d 627.

It appears that prior to the filing of the complaint upon which the Board order was entered in this case, a complaint had been filed, alleging violation by the respondent of Section 8(1), (2), and (3), of the National Labor Relations Act, 29 U.S.C.A. § 158(1–3). The charges in this complaint were in part withdrawn and in part settled. The order here sought to be enforced is based upon charges that respondent had violated Section 8(1). However, the Board entered a general cease and desist order based upon findings of violation by the respondent of Section 8(3) of the Act.

■ We are of the opinion that Paragraph 1(a) and (b) and subsection (c) (1) of paragraph 2 of the order, based upon the latter portion of the statute, were improvident and should be eliminated. See

National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S. Ct. 693, 85 L.Ed. 930.

The order of the Board will be modified to the extent above indicated, and a decree entered, granting enforcement.