**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PURITY FOOD STORES, INC. (Sav-More Food Stores, Respondent.**

**No. 6582.**

United States Court of Appeals First Circuit.

Heard on Remand March 6, 1967.

Decided May 8, 1967.

Glen M. Bendixsen, Washington, D. C., Atty. with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Thomas R. Beech, Atty., Washington, D. C., were on brief, for petitioner.

Allan A. Tepper, Boston, Mass., with whom Snyder, Tepper, Berlin & Katz, Boston, Mass., was on brief, for respondent.

Before ALDRICH, Chief Judge, WOODBURY,* Senior Circuit Judge, and COFFIN, Circuit Judge.

WOODBURY, Senior Circuit Judge.

This court on a previous petition for enforcement affirmed the Board's findings that the respondent had improperly interfered with its employees' efforts to organize by surveillance and overly hostile anti-union talk in violation of § 8(a) (1) of the Labor Management Relations Act, 1947, 29 U.S.C. § 158(a) (1). But the court was dissatisfied with the Board's determination that only the Peabody store in the respondent's supermarket chain constituted an appropriate collective bargaining unit. Wherefore the court declined to enforce the Board's order to bargain collectively as required by § 8(a) (5) of the Act and remanded to the Board for further proceedings. NLRB v. Purity Food Stores, Inc., 354 F.2d 926 (C.A. 1, 1965). The Board, in spite of this court's statement that "in our opinion it would be difficult to find a more integrated operation, or less difference among employees," nevertheless, in a supplemental decision and order, reaffirmed its previous determination that the respondent's Peabody store constituted an appropriate collective bargaining unit and has again petitioned for enforcement.

The respondent operates a chain of 7 supermarkets in Massachusetts. All stores are located north of Boston and all are within a 30-mile radius of the respondent's central office in Chelmsford. All stores are located in relatively small communities, the largest being Peabody with a population as of the 1960 federal census of 32,202.

On May 13 and 14, 1964, a majority of the full and regular part-time employees at the respondent's Peabody market signed cards requesting representation by Local 1435, Retail Clerks International Association, AFL–CIO. No effort was made at that time to organize the clerks at any of the other 6 markets in the chain. The sole question here is whether the employees at that market constitute an appropriate collective bargaining unit.

In its supplemental decision the Board made more specific and detailed findings of fact than it vouchsafed in its original decision. It found, as the evidence clearly requires, that the respondent's merchandising practices are highly centralized. Specifically, the Board found substantially as follows: The respondent's central office determines the merchandise to be sold in the stores, how the stock shall be displayed and fixes uniform sales prices throughout the chain. Promotional sales, when held, take place uniformly in all seven stores. All merchandise is purchased and paid for by the respondent's central office. All vendors are selected by central office executives who negotiate prices which are not disclosed to local store managers. Except for purely local news media, such as newspapers with only a local circulation, all radio advertising and advertising in Boston metropolitan newspapers identify the locations of all seven stores. Local store managers have the responsibility of keeping the shelves in their stores stocked. To accomplish this they have authority to order goods from the vendors selected by the central office [1]

---

* Sitting by designation.

1. We are not impressed by the Board's attempt in a footnote to intimate that this authority indicates substantial local autonomy by characterizing it as authority to "purchase," and by suggesting that it involves power to pledge the respondent's credit to an extent sufficient to "reflect

and to transfer stock from store to store as required which, the Board found, "is frequent and continuing." From October, 1962, to May, 1964, 162,311 units of groceries were transferred between stores.

Administratively the respondent's operation is also centralized. Certain central office executives are assigned responsibility for purchasing specific categories of merchandise, such as meats, groceries, produce, etc. for all seven stores, and each such executive has responsibility for supervising his category of merchandise in all seven stores.

In addition to his chain-wide duties each executive also is assigned over-all responsibility for the operation of a specific store or stores. Thus one Goggins, the executive responsible for buying groceries for all stores and for the grocery departments in all stores, has over-all responsibility for the respondent's stores in Peabody and Billerica. He therefore spends part of his time in the central office and part of his time in the various stores with the major part of his out-of-office time in the two stores in his particular charge.[2] The Board found that respondent's telephone expense of about $1,500 per month showed a "close and continuing liason" between the stores and between the stores and the central office.

Daily receipts from all seven stores are transferred to the respondent's general bank account. Employee security is handled by a single officer at the central office. Insurance of every kind is contracted for centrally and is applicable to the chain as a whole. All refrigeration maintenance work, electrical work and laundering of uniforms is done for all stores under contracts with outside contractors.

Finally, and of primary significance, the respondent's personnel practices and procedures are also both centralized and integrated. The Board found that employees in certain departments (i. e., meat, produce and delicatessen), are hired by the central office executives responsible for purchasing and merchandising those products for the chain. Some full-time grocery clerks are hired at the store by the central office executive having over-all charge of the store, and others are hired at the central office in Chelmsford and assigned to whatever store may be shorthanded. Some part-time employees are hired by the local store managers but most of them are hired by the central office executive responsibile for the store. In a footnote appended to those findings the Board noted that although there was testimony showing a general policy of central hiring of meat, delicatessen and produce employees for the chain, specific testimony showed that of about 107 employees at the Peabody store "all part-timers are hired at the store, and only 3 or 4 full-time employees were hired centrally and referred to that store." The signifi-

upon the economic success of a particular store." Should a local store consistently over-stock an item, the situation to the extent not corrected by transfer to another store would certainly be corrected by the central office executive in charge of the store under the administrative procedures to be considered presently.

2. The Board in another footnote conceded that Goggins "is actively engaged in day-to-day supervision" of the Peabody store. However, it rejected the respondent's assertion that he and the other central office executives actively supervised the day-to-day activities in their respective departments in all seven stores. It said that although there was testimony to that effect, "it strains credulity to conclude that the executives, rather than the store manager and department heads, are, in addition to their other duties, actively engaged in hour-by-hour or day-by-day supervision of the various departments throughout the chain."

cance of the place of hiring escapes us. What is significant is that employees are not hired by local store managers, except apparently for a few casual part-timers, but are hired by central office executives.

All cashiers are hired and trained by a central office executive who determines after a trial period whether a cashier is to be retained in employment. All employment is effectuated on the basis of uniform application forms prepared by the central office, and all new employees are given the company's employee manual. Almost all firing is handled by the central office executive in charge of the particular store involved, or at least after consultation with him. The testimony is that local store managers may discharge on their own responsibility only for "some outrageous activity."

At the end of each week time cards are sent from all stores to the central office where all personnel records are kept and from which all pay checks are issued. Job classifications and wage rates in each classification apply uniformly in all stores. General wage increases, when granted, apply to the employees in all stores. Fringe benefits such as paid vacations and holidays, sickness and accident insurance benefits, Blue Cross and Blue Shield and a profit-sharing retirement plan apply uniformly in all stores. Paid vacations are based on the individual employee's continuous employment in the chain and when two employees in the same category in the same store apply for the same vacation period, the central office gives first choice to the employee with the greater chain-wide seniority.

There are approximately 400 employees in the respondent's chain and there have been "numerous transfers," both temporary and permanent, from one to another of the seven stores, usually for the respondent's business convenience. During the two year period from June 1962 to May 30, 1964, there were 557 transfers, 118 being in to and out of the Peabody store. Moreover, some employees regularly divide their normal work week between two stores, and frequently an employee, in addition to working his normal work week in one store, works overtime in another. In all such cases the employee is paid by a single check issued from respondent's central office.

The Board said that it agreed with the respondent "that the record fairly construed reveals that operation of its various stores is accomplished through a substantial degree of centralized control." And it said that it was "mindful" that unit findings ought not to ignore the desirability of accommodating the opportunity of employees to organize with management's ability to run its business and that it was in "complete agreement" with this court's statement in its earlier opinion that "there should be some * * consideration given to the employer's side of the picture, the feasibility, and the disruptive effects of piecemeal unionization." Nevertheless the Board reaffirmed its previous determination that the Peabody store alone constituted an appropriate unit for bargaining.

The Board rested its conclusion basically on lack of store-wide bargaining history [3] and on its view that the Peabody store was so economically independent of the other retail stores and possessed such "significant autonomy" within the respondent's over-all operation that separation of that store from the others for purposes of collective bargaining would not obstruct centralized control and effective operation of the chain. We cannot agree.

It seems to us obvious that in view of the frequent interchange of employees

3. This is true so far as it goes but it does not mention the failure of the Union to organize the stores in a consent chain-wide election in 1961.

from store to store, either permanently or for part-time work, only friction between employees and chaos in labor relations could possibly result if some employees were under union rules as to wages, hours, seniority, grievance procedures, etc. when the employees working beside them in the same category were not. The Board's conclusion to the contrary flies in the face of reality.

The evidence and the Board's specific findings based thereon disclose a small, compact, homogeneous, centralized and integrated operation. The findings now made confirm this court's previous view that "it would be difficult to find a more integrated operation, or less difference among employees." Under some circumstances a single store in a retail chain may constitute an appropriate bargaining unit. But on the evidence and findings in this case we can see no rational basis for fractionating the respondent's organization for purposes of collective bargaining.[4]

■ We do not lightly disagree with the Board in matters of unit determination. We are not unaware of the difficulties involved in making unit determinations which will "assure to employees the fullest freedom" in exercising their right to organize as required by § 9(b) of the Act without running afoul of § 9(c)(5) of the Act forbidding the Board to treat the extent to which employees have organized as "controlling." And we recognize the particular difficulties involved in making unit determinations in the retail chain store industry which will protect employees' statutory rights while at the same time giving the employer reasonably adequate protection from the "disruptive effects of piecemeal unionization" to quote this court's previous opinion. See 79 Harv. L.Rev. 811. Nor are we unaware that § 9(b) of the Act confers broad discretion on the Board in unit determination and

that its determinations invoke "of necessity a large measure of informed discretion and the decision of the Board, if not final, is rarely to be disturbed." Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947).

Nevertheless the Board must articulate substantial reasons for its unit determinations. NLRB v. Metropolitan Life Insurance Co., 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965). No such reasons have been offered. The "independence" of the stores in the Purity chain amounts to no more than a few miles of physical separation and the consequent division of a few ministerial responsibilities. This is far from enough. NLRB v. Frisch's Big Boy Ill-Mar, Inc., 356 F.2d 895 (C.A. 7, 1966). The Board's simple declaration that single store units are considered "presumptively appropriate" adds nothing, especially since the Board declared as recently as 1963 that "*the* appropriate bargaining unit in retail chain operations should embrace the employees of all stores within in an employer's administrative or geographical area." Weis Markets, Inc., 142 NLRB, 708, 710 (emphasis added). To be sure the selection of an appropriate bargaining unit gives the majority of employees within that unit the bargaining representative they desire. But this selection may also affect the employer, employees excluded from the unit but affected by the selection, and minority employees within the selected unit.

■ We must always bear in mind that § 10(e) of the Act clothes the courts of appeals with authority to enter decrees "enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board." We have a statutory duty to perform in the premises and when, as here, we are unable to avoid the conclusion that the Board's unit deter-

---

4. NLRB v. Sun Drug Co., Inc., 359 F.2d 408 (C.A. 3, 1966), upon which the Board relies, is clearly distinguishable on its facts for in that case there was only strictly limited transfer of employees from store to store, and local store managers had much broader authority including authority to purchase some items and to hire and fire employees.

mination simply does not square with its specific findings, we would not perform our statutory function should we enforce.

A decree will be entered setting aside the order of the Board.