**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOU De YOUNG'S MARKET BASKET, INC., Respondent.**

No. 18160.

United States Court of Appeals
Sixth Circuit.

Jan. 17, 1969.

---

Herbert Fishgold, Atty., N.L.R.B., Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison M. Brown, Jr., Peter M. Giesey, Attys., N.L.R.B., Washington, D. C., on brief.

Eugene Alkema, Grand Rapids, Mich., for respondent; Varnum, Riddering, Wierengo & Christenson, Gary P. Skinner, Grand Rapids, Mich., on brief.

Before PHILLIPS, EDWARDS and CELEBREZZE, Circuit Judges.

CELEBREZZE, Circuit Judge.

Pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 151 et seq., the Board seeks enforcement of its order of June 21, 1966, directing Respondent Lou De Young's Market Basket, Inc., to bargain with Local 20, Retail Clerks International Association, AFL–CIO on request as the exclusive representative of the employees of Respondent's Grand Rapids, Michigan store. In addition to the bargaining order, the Board directed Respondent to cease and

desist from certain unfair labor practices in violation of Section 8(a) (1) of the Act; to reinstate with back pay three employees discharged in violation of Section 8(a) (3) and (1) of the Act; and to post the usual notices. Jurisdiction is admitted.[1]

Respondent is a Michigan corporation. Its sole stockholders, De Young and Wedgwood, manage the Grand Rapids store and another store that Respondent owns in Holland, Michigan. The Union, which began its organizational campaign on December 8, 1964, limited all of its efforts to the Grand Rapids store and successfully obtained valid authorization cards from a majority of that store's employees. When Respondent refused to recognize it, the Union filed unfair labor practice charges. The Board based its order on these events:

On December 7, 1964, Union Representative Vander Werff gave employee Wassen several Union authorization cards. Wassen divided them among some other employees, including Breedlove and Boosamra. On December 8th, Boosamra procured about ten signatures, obtained additional cards, and returned to the store to solicit more signatures. On the same day, Wedgwood and De Young began an antiunion campaign consisting of threats, surveillance, and interrogation. The Board found that this conduct violated Section 8(a) (1) of the Act.[2] Although Respondent does not seriously disagree with these findings, it challenges the Board's conclusion that these violations were substantial, preferring instead to characterize them as slight or "technical" infractions. This contention will be dealt with more fully in connection with our discussion of the Board's bargaining order. Finding substantial evidence in the record as a whole to support the Board's findings as to the foregoing violations, we grant enforcement of the Board's order respecting them.

## BOOSAMRA'S DISCHARGE:

■ On December 9th, while Boosamra was talking with two other employees, De Young walked in and summoned him to the loading dock in the rear of the store. De Young told Boosamra that he was out of a job and handed Boosamra's time card to an office employee with instructions to write out his check. After telling Boosamra to leave by a side door, De Young exclaimed, "that was just the beginning and there would be more."

Respondent urges that Boosamra was discharged for cause related to economic reasons: business had fallen off considerably and Respondent was taking corresponding steps to reduce its labor costs. Since Boosamra had been warned in the past about "goofing off", his discharge was essentially "just the beginning" of Respondent's attempts to align its labor force with the economic realities facing it.

Respondent's contention, however, is not borne out by the record. During the unfair labor practice hearing the following colloquy took place between the Board's counsel and De Young:

"Q. Now, Mr. DeYoung, you testified, as I recall that as a result of business slump your employment complement was away out of line with the volume of business you were doing, is that correct? A. Yes.

"Q. And consequently you were in the process of cutting back the number of employees. Is that correct? A. Yes.

"Q. But this had nothing to do with the discharge of Boosamra, is that your testimony? A. I fired Boosamra.

1. The Board's decision is reported at 159 N.L.R.B. 854 (1966).

2. Between December 8th, the start of the Union's campaign, and December 16th, the date fixed by the Board for Respondent's unlawful refusal to bargain, the Board found six Section 8(a) (1) violations, including the promulgation of an unlawful no-union solicitation rule. This figure does not include the discharges of three employees which are also violations of Section 8(a) (1) of the Act.

"Trial Examiner: I beg your pardon?

"The Witness: Boosamra was discharged for his activities."

The Trial Examiner concluded that Boosamra's "unsatisfactory activities," were his support for the Union and that this prompted his discharge by Respondent in violation of Section 8(a) (3) of the Act. The Board agreed and ordered Boosamra's reinstatement with back pay. We enforce the Board's order.

BREEDLOVE AND ALBIN'S DISCHARGES:

On December 10th, Breedlove solicited employees during working hours. He was observed by Wedgwood. As Breedlove prepared to leave for the day, Wedgwood approached him and warned Breedlove that he was neglecting his work and not to spend working time on "outside activities." Breedlove asked if Wedgwood meant union activities, and if this was an ultimatum. Wedgwood gave affirmative answers to both questions.

The next day, Breedlove and Albin asked their supervisor if they could see Wedgwood. They entered Wedgwood's office together and Wedgwood asked what they wanted. Breedlove replied that he and Albin were "100 percent for the Union." Wedgwood asked why they were telling him something he already knew; Breedlove said that he felt it was his duty. Wedgwood asked Albin if he felt the same way; Albin said he did. Wedgwood then reminded Breedlove about the warning he had given him. At this point De Young walked in, he and Wedgwood exchanged glances, and Wedgwood, "threw up his hands" and told Breedlove and Albin to "go punch out."

The Trial Examiner found no violation of Section 8(a) (3) of the Act in Respondent's discharge of Breedlove and Albin: "I find that it was the extent of Breedlove's activity when he should have been working, not * * * [his] support of the Union which prompted the discharge." The Board, however, disagreed:

"In this context of vigorous antiunionism we conclude that Wedgwood's discharge of Breedlove and Albin * * * was in furtherance of the Respondent's effort to stop the union campaign by coercive measures, and not merely because he considered that their brief, excused absence from their work stations and the announcement to him of their union support amounted to insubordination. Their declaration of sympathy and support for the Union, made to Wedgwood at a time when he and De Young were intent upon blocking the Union, we find was the real motivation for the discharges, thereby constituting those discharges a violation of Section 8(a) (3)."

The "context" of Breedlove and Albin's discharges, according to the Board, consisted of Respondent's numerous unfair labor practices—the threats, interrogations, and surveillance; Boosamra's unlawful discharge; and a further finding that Wedgwood's ultimatum to Breedlove was an invalid no-union solicitation rule.

Respondent urges, on the other hand, that Breedlove and Albin were fired for neglect of work—"for a particularly brazen and provocative neglect of duties done in the face of a specific warning against it."

Neglect of work is of course good cause for discharge, and a context of vigorous antiunionism does not transmute such neglect into protected activity. Yet if Wedgwood's aim in discharging Breedlove and Albin was to strike at the Union, the discharges would be unlawful even if Wedgwood had cause to discharge them. N.L.R.B. v. Challenge Cook Bros., 374 F.2d 147 (6th Cir. 1967); N.L.R.B. v. Mid-West Towel & Linen Service, Inc., 339 F.2d 958 (7th Cir. 1964). The Board, not the courts, has the delicate task of divining an employer's motives from the confusion generated when spirited organizational activity clashes with comparable efforts to eliminate it. N.L.R.B. v. Bersted Mfg. Co., 124 F.2d 409 (6th Cir. 1942). Consequently, we must defer to the Board's construction of Wedgwood's motives if

there is substantial evidence in the record as a whole to support that construction. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 17 S.Ct. 456, 95 L.Ed. 456 (1950); N.L.R.B. v. Power Equipment Co., 313 F.2d 438 (6th Cir. 1963). The fact that the Trial Examiner disagreed with the Board's conclusion does not alter our search for substantial evidence since the Board may, without consequence, reject the recommendations of its Trial Examiners. *Universal Camera Corp.*, supra; Joy Silk Mills v. N.L.R.B., 87 U.S.App.D.C. 360, 185 F.2d 732 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350.

■ Wedgwood's warning of December 10th to Breedlove was, as the Board concluded, an invalid rule against union solicitation and a violation of Section 8(a) (1) of the Act. Its invalidity rested on the fact that other kinds of solicitation flourished during working hours.[3] Although an employer may lawfully restrict solicitation on working time, he cannot discriminate against union solicitation. See National Labor Relations Board v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975; TRW, Inc. v. N.L.R.B., 393 F.2d 771 (6th Cir. 1968). Wedgwood's warning, insofar as it amounted to an unfair labor practice, indicates Respondent's improper motive in discharging Breedlove. N.L.R.B. v. Bersted, 124 F.2d 409 (6th Cir. 1942).

■ In further support of the Board's conclusion that Respondent discharged Breedlove and Albin for their union sentiment is the fact that Albin had never been warned. Since Wedgwood discharged Breedlove and Albin as one, the Board could rightly conclude that their simultaneous declaration of union support, made in the context of Respondent's antiunion activity and at a time when union activities were on Wedgwood's mind, triggered the discharges. See TRW, Inc. v. N.L.R.B., 393 F.2d 771 (6th Cir. 1968). "[N]either the Board nor the courts can read the minds of men." Joy Silk Mills v. N.L.R.B., 185 F.2d 732 (D.C.Cir. 1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734. We feel, nonetheless, that the Board's interpretation is reasonable on the whole record. We therefore enforce the Board's order as it relates to the reinstatement of Albin and Breedlove.

THE REFUSAL TO BARGAIN:

The Board, reversing the Trial Examiner, determined that Respondent had violated Section 8(a) (5) of the Act by refusing to bargain with the Union as exclusive representative of the employees of the Grand Rapids store. The events leading to the Board's order are best illuminated by Union Representative Vander Werff's credited testimony about a meeting of December 16th between he and Wedgwood near Wedgwood's office at the rear of the Grand Rapids store. Vander Werff testified as follows:

" * * * I asked Mr. Wedgwood if he had a few minutes or seconds, and he said no. * * * I asked him if he had an answer yet with regard to Breedlove and Albin and Boosamra. He said no comment and I said then at this time I would like to inform you that as representative of the retail store employees union ˙local #20 we represent a majority of your employees, have them signed on cards which I took out of my pocket and showed him and said we would like to set down [sic] and negotiate wages, hours and working conditions and we are willing to prove our majority.

* * * * * *

"Q. Do you recall having said anything else at this time? A. Yes. When I mentioned it to him, when I stated the last phrase, we represented a majority of the employees of this store, that comes back to me.

"Q. Did you show him the cards? A. I showed him the cards, yes.

3. Sports pools, raffles, and gift collections, with management approval, took place periodically. At Christmas employees would collect money for gifts for Wedgewood and De Young.

"Q. In what manner did you show him the cards? A. I took them out of my pocket and attempted to spread them out in his presence. They were in a stack and I attempted to fan them out.

\* \* \* He said no I don't want to hear it. Threw his hands over his head and above his head, by his head, and ran to his back office.

"Q. Now when he did this, what did you do? A. I followed him to the back office and put my foot in the door, preventing him from closing it.

"Q. Did he attempt to close the door? A. Yes, he attempted to close it and kicked at me, and told me—

"Trial Examiner: What? Kicked at you?

"The witness: Kicked at me.

"Q. Kicked at what part of you?

"A. My foot.

"Q. Your foot was in the door? A. My foot was in the door and he was kicking at it trying to force me to pull my foot out of the door.

"Q. Did you say anything while this was going on?

"A. Yes, I said I am a representative of the retail store employees union local 20 and we represent a majority of employees and have them signed on cards and we are willing to prove this and we want you to set down [sic] and negotiate for wages, hours and working conditions of the employees in this store. He said to me get out, I will call the cops. I waved the cards in front of him once again and showed them to him in a stack and fanned them out a little bit and then I pulled my foot out of the door and left."

On the same day, the Union wrote to Respondent confirming what took place earlier, and offering again to prove its majority status. Respondent apparently received this letter on December 18th. On December 16th, after his encounter with Vander Werff, Wedgwood told employee Wassen that employees would be laid off if the Union came in and that the Union would not be able to make him negotiate a contract. The Board found that Wedgwood's statement violated Section 8(a) (1) of the Act.

On December 21st, after conferring with counsel, Respondent, in a letter signed by Wedgwood, replied to the Union's letter of December 16th. Respondent refused recognition, stating that it doubted the Union's majority because of certain information it had regarding the circumstances under which the authorization cards were obtained, but that it would bargain with the Union after an election was held to determine if "a majority of an appropriate group of employees in fact wish to be represented by you."

 The threshold question in determining whether Respondent's refusal to bargain violated Section 8(a) (5) of the Act is whether its Grand Rapids store was, as the Board concluded, an "appropriate unit" for collective bargaining purposes within the meaning of Section 9(b) of the Act. Respondent contends that the Holland store employees must be included in the unit. If Respondent is correct in its contention, insofar as all organizational activity was confined to the Grand Rapids store, the Union did not have cards signed by a majority of employees in an appropriate unit when Vander Werff demanded on December 16th that Wedgwood bargain with it.

 Section 9(b) of the Act vests wide discretion in the Board to determine the unit appropriate for collective bargaining purposes. See, e. g., N.L.R.B. v. Dewey Portland Cement Co., 336 F.2d 117 (10th Cir. 1964). The unit must be one that will "assure to employees the fullest freedom in exercising the rights guaranteed by [the] Act." Section 9(b), National Labor Relations Act. Courts must defer to the Board's expertise in carrying out this intent of Congress. Packard Motor Car Co. v. National Labor Relations Board, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947). In so doing, we will disturb unit determinations only if they are unreasonable, that is,

arbitrary and capricious. N.L.R.B. v. Merner Lumber & Hardware Co., 345 F.2d 770 (9th Cir. 1965); N.L.R.B. v. Sun Drug Co., 359 F.2d 408 (3d Cir. 1960). Obviously, there may be more than one unit that will guarantee employees a full measure of freedom to exercise the right to self-organization secured to them by Section 7 of the Act. A corollary to this is that the Board does not act at its peril, to be later overturned on review by a Court of Appeals, if it acts reasonably. Packard Motor Car Co. v. National Labor Relations Board, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); N.L.R.B. v. Winn-Dixie Stores, Inc., 341 F.2d 750 (6th Cir. 1965), cert. denied 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74.

 Under some circumstances, a unit embracing a single store of an employer chain will be appropriate for bargaining purposes. See N.L.R.B. v. Sun Drug Co., 359 F.2d 408 (3d Cir. 1966) and cases cited therein. Under other circumstances, however, such a unit may not be appropriate. See, e. g., N.L.R.B. v. Purity Food Stores, Inc., 376 F.2d 497 (1st Cir. 1967), cert. denied, 389 U.S. 959, 88 S.Ct. 337, 19 L.Ed.2d 368. The Board must look to the facts in each case and articulate its reasons for concluding that the unit designated by it is appropriate. *Purity Foods,* supra.

In the instant case, the Board determined that a unit limited to employees of Respondent's Grand Rapids store was appropriate because, from the viewpoint of Respondent's employees, the two stores were separate entities. The Board specifically found that each store had its own group of employees and, as of December 16th when the Union demanded recognition, its own man in charge. Of great significance to the Board was the fact that once the Holland store had

been adapted to the business methods of its new owners, employee interchange between the two stores was "limited and unpredictable." [4] Compare, N.L.R.B. v. Purity Foods, Inc., 376 F.2d 497 (1st Cir. 1967), cert. denied, 389 U.S. 959, 88 S.Ct. 337, (single unit inappropriate, much interchange) with Banco Credito y Ahorro Ponceno v. N.L.R.B., 390 F.2d 110 (1st Cir. 1968) (single unit appropriate, little interchange); see, N.L.R.B. v. Winn-Dixie Stores, Inc., 341 F. 2d 750 (6th Cir. 1965), cert. denied 382 U.S. 830, 86 S.Ct. 69. These findings, along with a geographical distance of twenty-two miles between the stores, buttress the Board's conclusion that the employees of Respondent's Grand Rapids store were an appropriate group for collective bargaining purposes. *Winn-Dixie Stores, Inc.,* supra. Thus, the Board's determination does not leave some employees under union rules and others working beside them on their own. *Purity Foods,* supra, at 501.

 The Board relied on additional factors in reaching its determination, namely, the absence of any bargaining history for employees of either store and the fact that no employees sought a broader bargaining unit. Although extent of union organization cannot control the scope of a unit, it may serve as a criterion in shaping it. National Labor Relations Board v. Metropolitan Life Ins. Co., 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965). We find no abuse of discretion on the part of the Board in designating the Grand Rapids employees as an appropriate unit for collective bargaining.

 Before an employer will be directed to bargain on the strength of authorization cards alone, the Union must show that it made a clear and unequivocal bargaining demand, N.L.R.B.

---

4. Respondent purchased the Holland store about nine months before the Union's organizing campaign began in Grand Rapids. When the smaller Holland store was first opened, Grand Rapids employees helped set up the displays and inventory goods. After the Holland store was operating, Grand Rapids employees were sent to Holland sporadically "to pick up papers on the side" or "to do a little stock once in a while." Grand Rapids employees characterized it as "a pretty big thing" to go to Holland; Holland employees, however, were never sent to Grand Rapids.

v. Richman Bros., Inc., 387 F.2d 809 (7th Cir. 1967), and that the employer lacked a good faith doubt concerning the Union's majority status when it denied recognition. N.L.R.B. v. H & H Plastics Mfg. Co., 389 F.2d 678 (6th Cir. 1968); Pizza Products Corp. v. N.L.R.B., 369 F.2d 431 (6th Cir. 1966); Furr's, Inc. v. N.L.R.B., 381 F.2d 562 (10th Cir. 1967), cert. denied, 389 U.S. 840, 88 S.Ct. 70, 19 L.Ed. 2d 105. Here, as elsewhere, good faith or honesty yields rewards, namely, a representation election in which all bona fide doubts of an employer may be settled.[5] Pulley v. N.L.R.B., 395 F.2d 870 (6th Cir. 1968); N.L.R.B. v. Jackson Press, Inc., 201 F.2d 541 (7th Cir. 1953).

■ The first issue is quickly disposed of. When Vander Werff approached Wedgwood on December 16th, he carried cards signed by a majority of employees in the Grand Rapids store. His demand that Respondent bargain with the Union as representative of the employees "in this store" was not only clear and forceful, but unequivocal as to which store Vander Werff meant. "This store" did not mean the Holland store, or the two stores together; it clearly meant the Grand Rapids store alone.[6] Cf. Lane Drug Co. v. N.L.R.B., 391 F.2d 812 (6th Cir. 1968). We next consider what, if any, good faith doubt Respondent had on December 16th as to the Union's majority.

Prior to December 16th, employee Ortega told De Young and Wedgwood that pressure had been put upon employees to sign authorization cards. The Trial Examiner, however, dismissed Ortega's testimony as insubstantial since neither Wedgwood nor De Young expressed any interest in what Ortega told them. The Board concluded that Respondent's unfair labor practices—before and after the bargaining demand—indicated Respondent's lack of good faith. In the Board's view, Respondent had completely rejected the principle of collective bargaining and was attempting to gain time to dissipate the Union's majority.

■■ We believe that the General Counsel has met his burden of proving Respondent's bad faith. N.L.R.B. v. River Togs, Inc., 382 F.2d 198 (2d Cir. 1967); Lane Drug Co. v. N.L.R.B., 391 F.2d 812 (6th Cir. 1968). Violations of Section 8(a) (1) of the Act may indicate that an employer's assertions of good faith doubt are spurious, N.L.R.B. v. Austin Powder Co., 350 F.2d 973 (6th Cir. 1965), especially where such violations are of the "flagrantly coercive" type, or where an employer continues to commit unfair labor practices after a bargaining demand has been made. N.L.R.B. v. Ben Duthler, Inc., 395 F.2d 28 (6th Cir. 1968).

In the instant case, there were several 8(a) (1) violations, including Wedgwood's threat after the Union's demand of December 16th to lay off employees and not deal with the Union. Also among Respondent's unfair labor practices were its discharges of Boosamra, Breedlove, and Albin. See N.L.R.B. v. Ben Duthler, Inc., supra. We disagree with Respondent's assertion that such unfair labor practices were merely technical viola-

5. Although this Court has said a number of times that it is "strong medicine" to base a recognition and bargaining order on the strength of authorization cards alone, see, e. g. Lane Drug Co. v. N.L.R.B., 391 F.2d 812 (6th Cir. 1968), we do not hesitate to enforce such an order in the absence of good faith dealings on the part of an employer. Atlas Engine Works, Inc. v. N.L.R.B., 396 F.2d 775 (6th Cir. 1968).

6. We agree with the Board that Respondent's refusal to bargain occurred on December 16th and whatever good faith doubt Respondent had must be measured

from that date. Once a request for recognition and demand to bargain are made an employer is to be granted a reasonable time to investigate the union's majority claim. N.L.R.B. v. River Togs, Inc., 382 F.2d 198 (2d Cir. 1967). Respondent, however, chose to ignore Vander Werff's oral demand, replying instead to the Union's letter which it received two days later. The letter, however, was a *second* demand that Respondent recognize and bargain with the Union. Since the Union need only ask once, Respondent is bound by its rejection of Vander Werff's earlier demand.

tions of the act, preferring instead to characterize Respondent's conduct from the inception of the Union's campaign as a substantial and sustained effort to thwart Respondent's employees in their efforts to organize its store.

Enforcement of the Board's order is granted.